Filed 3/11/13  In re Daniel R. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re DANIEL R. JR., a Person Coming Under the Juvenile Court Law. | B241800 (Los Angeles County Super. Ct. No. CK55893) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DANIEL R. SR., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Margaret Henry, Judge.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

This is the second time this court has considered an appeal in this matter. The first appeal was considered in appeal No. B226483, pertaining to Crystal A. ("Mother"), the mother of minor Daniel R. Mother appealed from the dispositional order of the juvenile court denying Mother reunification services pursuant to Welfare and Institutions Code[1] section 361.5, subdivisions (b)(10) and (b)(11). The juvenile court's findings were grounded on failure to reunify with Daniel R.'s siblings and Mother had not made a reasonable effort to address her drug problems that led to the removal of those children, leading the juvenile court to conclude that Mother's parental rights should be terminated. Mother had argued the juvenile court's dispositional order was not supported by substantial evidence. Mother asserted she had "worked to correct" her substance abuse problems. This court rejected Mother's arguments and affirmed the order of the juvenile court in an opinion filed on June 13, 2011. Daniel R. Sr. ("Father")[2] was not a party in appeal No. B226483. Consequently, this opinion addresses issues peculiar to Father's appeal. We occasionally make reference to Mother's prior appeal but only when context so requires.

In the current appeal, Father has raised issues pertaining to the necessary requirements for the beneficial-parental exception to apply. Father contends the juvenile court committed reversible error in terminating his parental rights. Father requests that the order terminating his parental rights be vacated and the matter remanded to the juvenile court with instructions by this court to conduct a new permanency hearing, taking into consideration the significant relationship Daniel R. shared with Father. Father contends the record contains substantial evidence that he had a significant and emotional

---

[1]    All further code references, unless indicated otherwise, are to the Welfare and Institutions Code.

[2]    Father and son have the same name. For clarity, the senior Daniel will be referred to as "Father" and the junior Daniel by his first name and last name initial "Daniel R."

bond with Daniel R. which was neither diminished nor nullified by any collateral relationships Daniel R. enjoyed with other family members, or by the relationship between Father and Mother. The loss of this father-son bond, so contends Father, would be incalculably detrimental to Daniel R. For the reasons hereafter stated, we affirm the order of the juvenile court.

## FACTUAL AND PROCEDURAL BACKGROUND

DCFS recommendations included reunification services for Father but not Mother. The recommendations included participation in a drug program with random drug testing, individual counseling, and a parenting class.

*Search for a suitable placement for Daniel R.*

Criminal checks revealed Mother had an extensive criminal history. Father had a criminal record for possession of a controlled substance and receiving stolen property. In its attempt to locate a suitable placement for Daniel R., DCFS found that Father's brother Leonard had a record for minor vandalism and resisting a public officer. DCFS could not process Annette M. (paternal grandmother) because the search turned up "too many subjects to identify." DCFS refused to place Daniel R. with Lisa V. (maternal grandmother) due to her own history with social services.

Early in the dependency proceedings, Father admitted having used marijuana in the recent past and claimed that mother had used crystal methamphetamine and alcohol while she was three to five month pregnant. Mother admitted she had been using drugs since age 13 but claimed she had recently stopped and was clean.

*Initial placement with maternal aunt Ann V.*

DCFS placed Daniel R. with Maternal aunt, Ann V., on July 8, 2010. DCFS also assessed the home of paternal grandmother Annette M. and found it to be appropriate. It recommended Father have overnight visits with Daniel R. in that home, provided Annette M. was present. Once he was determined to be the father, Father began visiting with Daniel R., and according to Annette M., who monitored his visits, he was an involved, hands-on parent. He fed Daniel R., held him, and changed him as needed. DCFS further reported Father was actively engaged in services, attending NA, and testing negative for

3

drugs. He had completed a series of five parenting classes, but DCFS felt he needed additional classes to parent an infant.

*Ongoing tension between maternal grandmother and Father.*

The record discloses ongoing tension between the maternal grandmother and Father, which appeared from the inception of the case when Lisa V. made allegations against Father in the hospital. The tension continued between the maternal side and Father, as maternal aunt Ann V. now complained she had to accommodate visits for Father because he did not have a car and was dependent for transportation on paternal grandmother Annette M. whose working hours as an on-call nurse varied.

*Recommended additional reunification services for Father.*

The Department recommended additional reunification services for Father. The animosity between the maternal and paternal side continued. Maternal aunt Ann V. alleged that Father must have abused Daniel R. because she noticed a bruise and swelling on the side of the child's head. However, when she took Daniel R. to be medically examined, the doctor found no serious concern of neglect. Social worker Haileselassi Hablezsi (H.H.) had independently interviewed maternal aunt Ann V., maternal grandmother Lisa V., paternal grandmother Annette M., Father, and the paternal uncles. H.H. concluded Daniel R.'s injury did not occur in Annette M.'s home, as claimed by the maternal relatives, because Annette M. presented him with time-dated pictures of the child while in her home and the pictures showed no injuries. H.H. believed there was a great deal of tension between the maternal and paternal relatives, and the maternal relatives were attempting to sabotage Father's reunification.

*Recommendation that maternal grandmother Lisa V. not be allowed to further care for Daniel R.*

Based upon H.H.'s findings of alienation by the maternal family, especially by maternal grandmother Lisa V., the Department's worker recommended that Lisa V. no longer be allowed to care for Daniel R.

*Illness of Daniel R.*

The inter-family tension continued, during a period when the child was ill, with each side seeking their own medical care for Daniel R. He was diagnosed in December 2010 with bronchitis and chronic heart murmur. This turned into pneumonia by January 2011. The child was otherwise developing age-appropriately, and was a mellow and happy child.

*Recommendation that reunification services continue for Father who was in partial compliance.*

By November 2010, DCFS recommended that reunification services continue for Father, who was in partial compliance. Father was having a difficult time maintaining his employment and also complying fully with the case plan. However, he had attended some sessions of his drug program and continued to test negatively. He also completed a TYKES class, which focused on the development and care of young children. By January 21, 2011, Father had completed a three month drug program. His counselor stated that Father met all the program goals and no longer needed to attend. Father continued to test negative for drugs.

*Unannounced visit to Father's home.*

Father continued visiting regularly with Daniel R. On January 8, 2011, during an unannounced visit to Father's home, the worker found it neat and clean. Daniel R. was not feeling well that day, but Father was holding and comforting his son, and Daniel R. was responding to his father's efforts.

*Results of Father's prohibited reestablished contact with Daniel R.'s mother.*

Father's situation changed by February 2011 because he had reestablished contact with Daniel R.'s mother. Paternal grandmother Annette M. and he argued, culminating in her kicking her son out of her home. By the August 26, 2011, 12-month review, Father was residing with Daniel R.'s mother but they would not provide the worker with their address. Father's last drug test on February 25, 2011, was negative, but he had subsequently failed to show for testing on three other occasions. He said he could no longer test because he lacked the transportation to get to the testing sites, now that his

mother refused to transport him. On several occasions, the worker provided Father with referrals for additional parenting classes, but she could not reach Father thereafter.

*Father's visits cancelled when social worker could not verify his address.*

The worker cancelled Father's visits starting February 25, 2011, because she could not verify his address. By March 24, 2011, Ann V. and Lisa V. no longer wanted to monitor Father's visits. During a telephone conversation with the worker, Father demanded his unmonitored visits be reinstated, but the worker refused to do so until Father resumed complying with the case plan and showed he had stable housing. Father responded with anger, stating he would not visit at all unless allowed unmonitored visits, and hung up. DCFS recommended the court terminate Father's reunification services.

*Domestic battery arrest of Father.*

In August 2011, Father was arrested for domestic battery against Daniel R.'s mother. The responding officer found mother hysterical and unable to give any details of the incident. She stated both that Father hit her, while also denying that he did so. She did not have any injuries, and appeared to be incapacitated and under the influence of alcohol. She subsequently told the police officer she did not want to prosecute Father because he did not hit her.

*Department's 366.26 report dated January 5, 2012, questioning maternal aunt Ann V.'s suitability for adoption.*

In its 366.26 report dated January 5, 2012, DCFS informed that the adoption assessment was still not completed because maternal aunt Ann V. was consistently unavailable to speak with the worker for half a year, April to October of 2011. Although the worker had left yet another message on December 6, 2011, Ann V. had not responded by the date of the reporting.

Although the Department recommended termination of parental rights, it questioned Ann V.'s suitability as permanent caretaker for Daniel R. The worker presented Ann V. arrived home late in the evenings, and had been generally unavailable to complete Daniel R.'s adoption assessment.

6

*Quality of Father's visits at DCFS offices.*

Father was visiting regularly with Daniel R. at the DCFS offices. He was observed to play with the child appropriately, and demonstrated patience when the child was fussy. His interaction with his son was significant and he had appeared to have established a parental bond with his son. Father had also complied and continued to comply with the case plan by completing a substance abuse treatment program and parenting classes. The worker asked the court to admonish Lisa V., Daniel R.'s daytime caregiver, for trying to sabotage Father's visits. She was constantly interfering during his DCFS visits, and this was a significant stressor for the child.

*Father's 388 petition; conflicting reports from DCFS; and court's attempts to reconcile reports.*

The Department's January 5, 2012, report addressing Father's 388 petition, prepared by social worker Evita Salas, conflicted with the information in its 366.26 report. DCFS recommended the court deny Father's 388 petition requesting reinstatement of reunification services because Daniel R.'s best interest would not be served by granting the petition. This was based upon the maternal relatives alleging Father was abusive towards them and might still be using controlled substances. And, although during visits Father would hold Daniel R., laugh with him, play games with him, or read to him, there were times when he did not know how to soothe his child and get him to stop crying.

On January 5, 2012, the court ordered the Department to investigate further and reconcile its two conflicting reports of that day, one by the DI Carr, the other by the social worker Evita Salas. In response to that order, on February 24, 2012, two additional reports were submitted, which in spite of attempts to be reconciled, still presented a different thrust and coloring of facts, depending on the author.

DI Carr's supplemental report stated that after interviewing both parents and grandparents, the DI now believed that the parents had a sporadic, and sometimes conflictual relationship, with some mutual domestic violence and many verbal arguments. Neither parent appeared to accept full responsibility for his or her actions. Mr. Carr

7

claimed he did not know of this history when he prepared the prior report, and it now presented an impediment to father being allowed to parent his child. Therefore, it was more prudent that Daniel R. be adopted. The bond he had previously noted between father and son now no longer presented a barrier to Daniel R.'s adoption.

According to Mr. Carr, the conflicting information previously provided the court on January 5 was because the 388 report prepared by worker Evita Salas had relied on outdated information. However, both January 5 reports were correct regarding maternal grandmother Lisa V.'s considerable obstruction of Father's contact with his child and her attempts to manipulate the child's moods, which impacted the child's visits with his father. Nevertheless, Mr. Carr now reported that although Father had greatly improved his relationship with Daniel R., he had not demonstrated significant progress with the case plan to deter Daniel R.'s adoption.

*DCFS's desire to continue to pursue adoption.*

DCFS wanted to continue to pursue adoption, and requested the hearing be continued to February 24, 2012.

Worker Evita Salas' February 24, post-permanency report presented much the same information previously reported on January 5, 2012. Daniel R. was developing age-appropriately, and was scheduled to begin a head start program for the school year starting in July of 2012. Father had started visiting with Daniel R. again on November 4, 2012, after an 8-month break. Some of Father's visits had been cancelled because paternal grandmother Annette M., his source of transportation, had to work, or she brought him to the visit later than the 15 minute window Father was allowed. Worker Evita Salas reported that at times the child was fussy and cried during visits, notably when the paternal grandmother Annette M. was present. However, the child stopped crying when he saw his father. He also stopped crying when the paternal grandmother left the visitation room and father and son were left together. As a young father, Father was sometimes nervous in getting Daniel R. to stop crying. However, he was able to handle the situation when Daniel R. was not well and threw up. Father cleaned his son, and thereafter engaged the child on and off.

*Parents' continued relationship and safety concerns for Daniel R.*

The parent's relationship continued to present a safety concern for Daniel R. and his return to either parent. In her statement to the Department's worker, maternal grandmother Lisa V. stated *she* was seeking custody of Daniel R. because *her sister*, Ann V., was a good caretaker. Ann V. had decided to be more involved in Daniel R.'s care and had quit her job.

*Father's statement of desire to obtain custody of Daniel R.*

Father stated he wanted to obtain custody of his son, and had completed three months of outpatient drug treatment in December of 2010, three months of parenting in October of 2011, and three months of domestic violence training in December of 2011. He had also not smoked marijuana since March of 2010, and was no longer living with the child's mother.

*DCFS's revised report on uncooperative behavior by maternal aunt Ann V.*

Starting February 24, 2012, the Department revised its prior reporting of how uncooperative maternal aunt Ann V. had been with the adoption process for more than half a year. Ann V. was now cooperating with the process, and with Lisa V.'s help, was committed to caring for the child. On May 31, 2012, DCFS informed that maternal aunt Ann V.'s home assessment had been approved. Ann V. was now prepared to adopt Daniel R. if reunification with the parents was not possible. Daniel R. appeared to have a bond with Ann V. and Lisa V. The Department continued to recommend termination of parental rights.

*Permanency hearing on May 31, 2012.*

At the permanency hearing held on May 31, 2012, Father testified that he shared a good relationship with his son. He was visiting regularly with his son every Friday, for an hour and a half. Since the prior court date, he had only missed one visit due to work. During visits, he played with Daniel R., read to him, and took him breakfast and fed him. The child ran up to him at the inception of the visit and called him "Daddy." He was attempting to teach his son the alphabet and his numbers. The father-and-son bond had

9

grown stronger in the past six months. His son recognized him as his father, and kissed him goodbye at the conclusion of the visits.

The court found the child to be adoptable, and that Father had failed to establish the parental bond exception. Although Father was visiting more consistently in the past six months, his caretaker for all purposes had become the child's mother. Therefore, the court terminated parental rights, and designated the caretaker, maternal aunt Ann V., as the prospective adoptive parent. Over Father's objection, the court ordered all future visits with Daniel R. were to be entirely at the caretaker's discretion.

## APPELLATE CONTENTIONS

### Appellant's contentions

Father contends that substantial evidence supported a finding that Father and Daniel R. shared a strong and beneficial bond, meeting the first requirement of the section 366.26, subdivision (c)(1)(B)(i) statutory exception to termination of his parental rights in Daniel R. Father further contends the court abused its discretion in finding that Father did not establish the parental-bond exception because the evidence showed he had forged a strong father and son bond which would be detrimental to Daniel R. to sever.

### Respondent's contentions

DCFS contends that substantial evidence supported the juvenile court's finding that appellant's relationship with Daniel R. was not so beneficial to Daniel R. as to outweigh the benefits of a permanent family.

## STANDARD OF REVIEW

On appeal after a court has rejected a parent's effort to establish the exception, two different standards of review apply. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Since the parent must first show the existence of a beneficial parental relationship, which is a factual issue, we uphold a court's express or implied finding that there is no beneficial relationship if supported by substantial evidence. (See *K.P., supra,* 203 Cal.App.4th at p. 621; *Bailey J., supra,* 189 Cal.App.4th at p. 1314.) More specifically, a challenge to a court's failure to find a beneficial relationship amounts to a contention that the

10

"undisputed facts lead to only one conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1529.) Thus, unless the undisputed facts establish the existence of a beneficial parental relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J., supra,* 189 Cal.App.4th at p. 1314.)

The second requirement for the exception is that the beneficial parental relationship constitute a "compelling reason for determining that termination would be detrimental." (§ 366.26, subd. (c)(1)(B); *K.P., supra,* 203 Cal.App.4th at p. 622.) Athough grounded in the facts, the court's determination on this issue is a "'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J., supra,* 189 Cal.App.4th at p. 1315; see also *K.P., supra,* 203 Cal.App.4th at p. 622.)

When a parent such as Father has visited extensively and had an established parental bond recognized even by the Department's workers, the substantial evidence supports the first prong of the application of the statutory exception. (*In re K.P.*, *supra*, 203 Cal. App. 4th 614, 622.) The determination then becomes whether under the facts of the case, there is a compelling reason for the court to order a plan other than adoption, and whether the court abused its discretion in failing to do so. (*Id.* at pp. 622-623.) Father bore the burden of establishing the exception in the trial court. (*In re Autumn H., supra,* 27 Cal. App. 4th 567, 574; *In re Andrea R.* (1999) 75 Cal. App. 4th 1093, 1107; *In re Tabitha G.* (1996) 45 Cal.App.4th 1159, 1164.)

In simplest terms, the establishment of the beneficial parental bond exception depends upon a parent having kept significant contact through visitations with his child, and the child having developed such a beneficial bond that it would be detrimental to sever it. The benefit from continuing that relationship with the parent would outweigh any benefit to the child derived from his adoption. (§366.26 (c)(1)(B)(i); *In re Autumn H.*, *supra*, 27 Cal. App. 4th 567, 575.)

11

Father argues he established both prongs of the parental relationship exception, and that the record in this case is supportive that his child would best benefit from a permanent plan such as legal guardianship which preserved an avenue for father and son to continue their relationship.

## *DISCUSSION*

When a court has not returned an adoptable child to the parent's custody and has terminated reunification services, adoption becomes the presumptive permanent plan. (See *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.) We note that Father does not challenge the juvenile court's finding that Daniel R. was adoptable. Considering its finding of adoptability, the juvenile court had to terminate parental rights unless it found one of the statutory exceptions to the preference for adoption applied. (§ 366.26, subd. (c)(1)(B)(i)-(vi).)

The statutory exception urged by Father, provides that once a child is found to be adoptable, parental rights must be terminated unless the court finds that termination would be detrimental to the child because "[t]he parents . . . have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) We note that it is the parent's burden to prove the exception. (Evid. Code § 500; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.)

As reasoned in *Autumn H.*, the parent–child relationship exception occurs when a significant parent-child relationship is found to exist. The juvenile court must then engage in a balancing test, juxtaposing the quality of the relationship and the deteriment involved in terminating it against the potential benefit of an adoptive family. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425; see also *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154-1156.)

As noted in *Autumn H.*, interaction between natural parent and child will always confer some incidental benefit to the child. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) However, showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent is not sufficient where that relationship does not meet the child's need for a parent. (*In re Jasmine D., supra,* 78

12

Cal.App.4th at pp. 1348, 1350.) "[F]requent and loving contact" alone is not sufficient. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1420.) A parent's failure to progress beyond monitored visitation with a child and to fulfill a "meaningful and significant parental role" justifies an order terminating parental rights. (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109.)

The factors to be considered when looking for whether a relationship is important and beneficial are: "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) "[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id*. at p. 468.)

We conclude that Father's sporadic contact with Daniel R. was by all accounts inconsistent and failed to satisfy even the initial prong of the beneficial parent-child relationship exception to termination of his parental rights. The lack of consistent visitation finds support in this record. Father did not consistently visit with Daniel. Further, he did not establish a beneficial parent-child relationship during the time he did visit. Daniel never lived with Father; Daniel was detained at birth after Father failed to go to the hospital to pick him up. Thereafter, Father refused to visit Daniel until a paternity test proved he was Daniel's biological father. After Father learned he was Daniel's biological father, he began four hour monitored visits at the paternal grandmother's home. On July 29, 2010, Father was granted overnight weekend visits in the paternal grandmother's home. That visitation was interrupted in November 2010, while the Department conducted a child abuse investigation. During that time, Father was offered monitored visitation, but he claimed he did not have time to visit.

By the time of the February 25, 2011 report, Father had stopped visitation with Daniel altogether. The paternal grandmother had asked Father to leave her home, and the social worker was unable to make contact with Father. The juvenile court restricted

Father's overnight visits until the Department could approve his home. In the meantime, his visits could be monitored by either the maternal grandmother or Daniel's caretaker.

In March, the caretaker reported that Father had not had a visit with Daniel since before the February 2011 court date. Neither the maternal grandmother nor the caretaker was comfortable monitoring Father's visits because of his behavior. Father told the social worker he would not visit unless he had unmonitored visitation.

Father made no effort to visit Daniel until October 28, 2011, when, after eight months, he contacted the social worker to request visitation. In February 2012, he testified that he missed eight months of visitation because he was working. When his visitation resumed, Father shared his visitation with the paternal grandmother.

When the selection and implementation hearing was held in May 2012, Father testified he missed one visit because of work, but paternal grandmother visited with Daniel. Father testified that during his visits, Daniel would run to him and calls him "daddy." Father read to Daniel, but Daniel would lose interest and play with toys. Father testified that he believed there was a bond between him and his son, and it was "better than it was before." According to Father, Daniel recognized him and was closer to him.

We note that the first prong of the exception described by section 366.26, subdivision (c)(1)(B)(i) requires that parents have maintained regular visitation. Father's off again and on again visitation with Daniel is not "regular visitation." Father voluntarily absented himself for eight months of Daniel's life.

Our conclusion is that the juvenile court committed no error.

### DISPOSITION

The order terminating appellant's parental rights is affirmed.


WOODS, J.

We concur:



PERLUSS, P. J.                                          ZELON, J.

14